```
      ___ FILED          ___ LODGED
      ___ RECEIVED       ___ COPY

             AUG 1 6 2021

      CLERK U S DISTRICT COURT
        DISTRICT OF ARIZONA
      BY_____ DEPUTY
```

Robert G. Furst
4400 North Scottsdale Road, #9-859
Scottsdale, Arizona 85251
(602) 377-3702
rgfurst@aol.com

Plaintiff *Pro Se*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Furst,<br><br>                        Plaintiff,<br><br>vs.<br><br>Manatt, Phelps & Phillips, LLP, and<br><br>Stephen S. Mayne,<br><br>                      Defendants. | Case No. **CV21-01405-PHX-SPL**<br><br>**COMPLAINT**<br><br>**(Jury Trial Requested)** |

## I.    Preliminary Statement

This Complaint arises out of Defendant Stephen Mayne's legal representation of Plaintiff Robert Furst and his ongoing fiduciary duties owed to him. Defendant Stephen Mayne is married to Plaintiff's sister, Linda Mayne. Linda Mayne loved her brother until 2018 or 2019, when he halted her fraudulent scheme to wrongfully acquire significant assets from their elderly parents' family trust. According to Linda Mayne, their parents had more than enough assets to support their lifestyle and she wanted her husband, Defendant Stephen Mayne, who was nearing 80 years of age, to retire sooner rather than later.

1

Unfortunately, when Plaintiff Robert Furst prevented Linda Mayne from completing her unlawful scheme against their parents, she went into a multiyear rage against him, which has still not ended.  While tying up her parents' assets in Arizona trust litigation and ERISA pension litigation, Linda Mayne has also tied up one of her brother's most significant assets – a partnership interest in Investor Clout, an Arizona partnership -- in two years of unnecessary litigation motivated solely by ill will and spite.   Linda Mayne has stated that she hates her brother; she has substantial financial resources; and she intends to use these assets to harass him for the rest of his life.

With regard to Investor Clout, Linda Mayne and the Stephen S. Mayne Exempt Trust are also Partners, together with Plaintiff Robert Furst.  The Partnership is now embroiled in internal litigation caused by Linda Mayne.  Defendant Stephen Mayne previously counseled Plaintiff Robert Furst in relation to Investor Clout, and his prior legal advice has jeopardized Plaintiff Robert Furst's interests and become the subject of dispute.  If Defendant Stephen Mayne tells the truth, the case is over, and his wife is fully exposed.  Instead, he has chosen to side with his wife, notwithstanding her endless wrongdoing, and has utilized his abundant legal skills to harm his former client, who relied on his prior advice.

Defendant Stephen Mayne has chosen to lie, conceal key evidence and discredit his former law client, all of which has caused irreparable harm to his former law client.  Thus, Plaintiff Robert Furst has brought this action against him and his law firm for breach of fiduciary duty.

## II.   Jurisdiction and Venue

1.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

2.   This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A).

3.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to the fiduciary breach claims occurred in this District.

4.     Plaintiff Robert Furst is a resident of Maricopa County, Arizona, and was a Co-Trustee of the Family Trust,

5.     Plaintiff Robert Furst was a law client of Defendants.

**B. Defendant**

6.     Defendant Stephen Mayne is a resident of Marin County, California.

7.     Defendant Manatt, Phelps & Phillips, LLP is a limited liability partnership formed under the laws of the state of California.

**III.    Relevant Facts**

**A.    Background Facts**

8.     Plaintiff is the brother-in-law of Defendant Mayne.

9.     Defendant Mayne is an attorney licensed to practice law in the State of California.

10.    Defendant Manatt is a law firm headquartered in Los Angeles, California.

11.    Defendant Mayne was a law partner at Defendant Manatt.

12.    Plaintiff was a client of Defendants.

13.    After retiring from the practice of law in 2004, Plaintiff was hired by Mortgages Ltd. Securities, L.L.C., an affiliate of Mortgages, Ltd., in 2005 to serve as an investor representative in relation to real estate loans originated by Mortgages Ltd. and thereafter sold to investors in fractional interests.

14.    In October 2007, Plaintiff, Linda Mayne, the Stephen S. Mayne Exempt Trust (the "Stephen Mayne Trust") and Leonard Rosenberg (the "Partners") formed Investor Clout.

15.    Linda Mayne is the wife of Defendant Mayne, and Leonard Rosenberg is a family friend of Plaintiff and Linda Mayne.

16.    The Partners contributed $1,800,000 to Investor Clout, and the Partners' initial capital contributions were as follows: (a) Plaintiff -- $1,000,000; (b) Linda Mayne -- $200,000; (c) Stephen Mayne Trust -- $500,000; and (d) Leonard Rosenberg -- $100,000.

17.    Based on the Partners' initial capital contributions, (a) Plaintiff owned a 55.56% partnership interest; (b) Linda Mayne owned a 11.11% partnership interest; (c) the Stephen Mayne Trust owned a 27.78% partnership interest; and (d) Leonard Rosenberg owned a 5.55% partnership interest.

18.    The partnership purpose was to invest in high-interest loans secured by Arizona real estate, and the Partnership's initial investment was a $1,800,000 loan to Mortgages Ltd. (the "Investor Clout Loan") in 2007, which was collateralized with fractional interests in four existing loans to third parties secured by real estate.

19.    The Investor Clout Loan was fully performing in 2007, with the partnership receiving monthly interest payments from Mortgages Ltd. at an annualized interest rate of 11% per annum.

20.    In the first quarter of 2008, Plaintiff raised concerns about the operations of Mortgages Ltd.

21.    Plaintiff retained the prominent Phoenix law firm of Snell & Wilmer to represent him.

22.    Plaintiff initiated a meeting with a representative of the Securities Division of the Arizona Corporation Commission ("ACC") to discuss his concerns.

23. On or about March 28, 2008, when Plaintiff informed the Chief Compliance Officer of Mortgages Ltd. that he had retained Snell & Wilmer to represent him, he was immediately suspended, with pay, and Mortgages Ltd. accused Plaintiff of making baseless allegations about the company.

24. In April 2008, Mortgages Ltd. offered Plaintiff a substantial settlement payment in exchange for silence, but he declined the offer.

25. When Plaintiff insisted upon a full internal investigation, his employment was terminated in late April 2008.

26. On June 2, 2008, Scott Coles, the CEO and sole owner of Mortgages Ltd. committed suicide.

27. On June 20, 2008, Mortgages Ltd. filed for Chapter 11 bankruptcy protection.

28. When Mortgages Ltd. filed for bankruptcy protection, Mortgages Ltd. was current on its monthly interest payments to Investor Clout under the Investor Clout Loan, and all of the underlying loans which collateralized the Loan were also current.

29. After Mortgages Ltd. filed for Chapter 11 bankruptcy protection, Mortgages Ltd. defaulted on the Investor Clout Loan, and the borrowers of each of the four underlying loans securing the $1,800,000 loan also defaulted.

30. As a result, after the foreclosure proceedings, Investor Clout acquired fractional interests in the four real properties that secured the four underlying loans.

31. Later in 2008, the Securities and Exchange Commission ("SEC") and the ACC began an investigation into Mortgages Ltd.

32. Plaintiff retained Defendants to represent him in relation to the investigation.

33. In October 2008, the SEC deposed Plaintiff, and Defendant Mayne represented Plaintiff at the deposition.

34. After the deposition, Defendant Mayne also counseled Plaintiff in relation to follow-up issues relating to, among other things, the investigation and the deposition.

35. In 2009, a Confirmed Plan of Reorganization for Mortgages Ltd. was approved by the Arizona Bankruptcy Court.

36. Pursuant to Mortgages Ltd.'s Confirmed Plan of Reorganization, ML Manager became the agent for the Mortgages Ltd. investors, including Investor Clout.

37. From 2009 through 2019, ML Manager managed, marketed and sold the four properties fractionally owned by Investor Clout and thereafter distributed the sales proceeds to Investor Clout.

38. In 2008 and 2009, the investors of Mortgages Ltd. began to realize that they would likely lose a substantial portion, if not all, of their investments from the sale of the properties, because (a) the local real estate market was falling into a recession/depression, and (2) exorbitant bankruptcy costs and attorneys fees were allocated proportionately to each of the properties, to be paid before any distributions were made to the investors.

39. Linda Mayne was particularly frantic because she had unlawfully taken $200,000 from her two children's accounts to fund her $200,000 initial capital contribution in Investor Clout, and she needed to repay the money to their accounts.

40. The two children of Linda Mayne (and Defendant Mayne), who were 20 and 22 years old, respectively, when Linda Mayne made the investment at Mortgages Ltd., were not "accredited investors" under applicable federal securities law,

and a securities investment at Mortgages Ltd. was an unsuitable investment for each of them.

41.   The Mortgages Ltd. investors began to focus on lawsuits against Mortgages Ltd.'s attorneys and accountants as the most likely source of any meaningful recovery of their investments.

42.   The Mortgages Ltd. investors targeted the malpractice insurance policies maintained by the attorneys and accountants of Mortgages Ltd., particularly the $100,000,000 policy maintained by Greenberg Traurig, the national law firm that provided legal representation to Mortgages Ltd.

43.   Certain investors organized to retain a well-known Phoenix law firm to file a class action lawsuit on behalf of the Mortgages Ltd. investors.

44.   Other investors considered the formation of separate "mass action" groups in which the investors would opt out of the class action and pursue their claims separately in a smaller investor group, in the hope that they could achieve a larger recovery than the class action investors.

45.   Most employees of Mortgages Ltd. or its affiliates were also investors in the loans originated by the company.

46.   Defendant Mayne advised Plaintiff that he would have a much more difficult time than other investors in prevailing in litigation against Mortgages Ltd.'s attorneys and accountants, because he was a former employee of its affiliate and certain legal defenses (e.g., *in pari delicto*) potentially applicable to former employees could bar or adversely impact his recovery.

47.   Defendant Mayne and Linda Mayne were concerned that Plaintiff's status as the Managing Partner of Investor Clout would negatively impact or even bar its recovery.

7

48.    Defendant Mayne advised that the "class action" and "mass action" groups would, most likely, choose not to allow former employees of Mortgages Ltd. or its affiliates to join their group.

49.    To mitigate against this possibility, Defendant Mayne recommended that Plaintiff transfer his 55.56% partnership interest in Investor Clout to Linda Mayne.

50.    As a result, in 2010, Linda Mayne purchased Plaintiff's 55.56% partnership interest in Investor Clout, in the hope that it would increase the likelihood that Investor Clout would be permitted to participate in an investor-plaintiff group.

51.    At the same time, in 2010, Linda Mayne replaced Robert Furst as the Managing Partner of Investor Clout.

52.    After the purchase, Linda Mayne owned a 66.67% partnership interest; the Stephen Mayne Trust owned a 27.78% partnership interest; and Leonard Rosenberg owned a 5.55% partnership interest.

53.    In 2010, the investors of Mortgages Ltd. organized into four investor-plaintiff groups to file lawsuits against Mortgages Ltd.'s attorneys and accountants for their role in the collapse of Mortgages Ltd.

54.    As predicted by Defendant Mayne, none of the investor-plaintiff groups permitted the joint representation of any investors who were former employees of Mortgages Ltd.

55.    Investor Clout joined an investor-plaintiff group – known as the Marsh Group – which filed a lawsuit against Mortgages Ltd.'s attorneys and accountants.

56.    Linda Mayne, as the Managing Partner, signed the representation agreement with the law firm representing the Marsh group.

8

57. Linda Mayne, as the Managing Partner, represented Investor Clout in the litigation and signed the settlement agreements at the conclusion of the litigation.

58. Plaintiff was not permitted to join the Marsh Group because he was a former employee of Mortgages Ltd. or an affiliate.

59. During the period from 2010 through 2015, the Marsh Group recovered more than $20,000,000 in negotiated settlements against Mortgages Ltd.'s attorneys and accountants, including approximately $400,000 which was recovered on behalf of Investor Clout.

60. Linda Mayne and the Stephen Mayne Trust, as Partners, benefited from Investor Clout's participation in the Marsh Group and received approximately $150,000 from Investor Clout as their share of the settlement recoveries that resulted from Investor Clout's participation in the Marsh Group litigation.

61. In conjunction with the plan devised by Defendant Mayne, Linda Mayne agreed to pay to Plaintiff an amount equal to the cash distributions which were attributable to the 55.56% partnership interest.

62. In 2016, after the litigation was concluded, Linda Mayne transferred the 55.56% partnership interest back to Plaintiff, and Plaintiff replaced Linda Mayne as Managing Partner.

63. For 2016 and all subsequent years, (a) Plaintiff had a 55.56% partnership interest; (b) Linda Mayne had a 11.11% partnership interest; (c) the Stephen Mayne Trust had a 27.78% partnership interest; and (d) Leonard Rosenberg had a 5.55% partnership interest.

64. Linda Mayne and Investor Clout have not paid to Plaintiff all amounts owed to him due to an alleged financial hardship.

65.   Linda Mayne and Defendant Mayne claimed that they needed additional time to pay Plaintiff because (a) they had substantial living and child-rearing expenses, and (b) Defendant Manatt was not paying Defendant Mayne what he deserved.

66.   In that regard, Linda Mayne told Plaintiff that Defendant Mayne was contemplating an age discrimination lawsuit against Defendant Manatt because he was inadequately compensated.

67.   From 2008 through 2015, Defendants continued to provide a significant amount of legal representation to Plaintiff in relation to Investor Clout and Mortgages Ltd. matters.

68.   At all times, Linda Mayne and Defendant Mayne praised Plaintiff for his integrity and courage in relation to Mortgages Ltd.

69.   However, everything changed in 2018, when Linda Mayne commenced a fraudulent and exploitive scheme against her parents and tricked them into signing amendments to their family trust and pension plan, together with financial powers of attorney appointing her as their financial agent.

70.   Linda told her parents that the documents were needed simply to enable her to help her parents to transfer funds from their brokerage accounts to their bank accounts in order to avoid "bounced" checks.

71.   When her parents realized that Linda Mayne had an unspoken objective to acquire some of their assets so Defendant Mayne could retire sooner rather than later, they were furious, and the family dynamic became her parents and Plaintiff in a united front against Linda Mayne.

72.   David wrote notes of his telephone calls with Linda expressing his outrage, including the following:

Linda, you did not return my call

I'm not on my own account only you & Bob
How did that happen
Power of attorney
You revoke cancel it right now
Revoke power of attorney
**You <u>never</u> told me it was a power of attorney**
**Just sign this – after flying in from SF**
**Who or what we're concerned about**
**I think you**
**Went to my account**
**They said – I didn't have one**
**You prevented me from accessing <u>my</u> account**
**Kind of underhanded**
 (Emphasis added)

*See Exhibit A.*

73.  Armed with these powers of attorney and trust amendments, Linda Mayne began to exploit her position of trust vis a vis her parents.

74.  Linda Mayne told Plaintiff that she did not want to wait until both of her parents died before she began distributing some of their assets to herself.

75.  Linda Mayne wanted to unlawfully transfer her parents' residence to herself and pay Plaintiff, out of her own pocket, for his "share," which Plaintiff refused to do. *See Exhibit B.*

76.  Linda Mayne threatened Plaintiff that, if he assisted their parents in opposing her, she would "tie everything up" for her parents and him, which meant that she would tie up the family trust and pension trust assets in litigation and tie up Plaintiff's upcoming Investor Clout distribution.

77.  Linda Mayne also threatened to Plaintiff that she intended to tell others that he had committed securities fraud while working at Mortgages Ltd.

11

78.   In February 2019, less than one week after her father died, Linda Mayne "froze" over $660,000 in her mother's trust account at TD Ameritrade and obstructed her access to this account. *See Exhibit C.*

79.   Under Linda Mayne's sole control, the account remained uninvested and inaccessible to her mother, while generating no income for her mother's support.

80.   Linda Mayne engaged in similar misconduct in relation to the DHF Corporation Profit Sharing Plan, in which her mother is the sole beneficiary, by (a) obstructing her mother from gaining any access to the pension funds, and then (b) freezing approximately $700,000 in pension funds, thus generating no retirement income for her mother.

81.   Linda Mayne traced/forged her mother's signature on checks written on a bank account in which Linda Mayne was not an authorized signatory. *See Exhibit D for the checks and handwriting report.*

82.   Concurrent with Linda Mayne's unlawful conduct in relation to her mother, Linda Mayne also attacked Plaintiff.

83.   In April 2019, utilizing her customary tactic of seizing assets that do not belong to her, Linda Mayne prevented Investor Clout from receiving more than $400,000 in sales proceeds to which it was entitled from ML Manager.

84.   Just like her hostile and unlawful actions which prevented her mother from gaining access to funds rightfully belonging to her, Linda Mayne also prevented distributions to Investor Clout for the hostile purpose of preventing Plaintiff (her brother) from obtaining his majority share of the distributions.

85.   The funds are presently being held in a trust account pending the outcome of litigation.

86. As a result, in early 2020, Plaintiff filed a breach of fiduciary duty lawsuit against Linda Mayne in Maricopa County Superior Court, *Robert Furst v. Linda Mayne, CV-2020-002498*.

87. The lawsuit also seeks a judicial dissolution of Investor Clout.

88. Linda Mayne and the Stephen Mayne Trust are parties.

89. Although Linda Mayne previously praised Plaintiff's integrity in relation to Mortgages Ltd., she now began to claim that he was dishonest and was not entitled to certain distributions because of illegality, unclean hands and other baseless allegations.

90. As part of her relentless attack against Plaintiff, Linda Mayne began to assert, for the first time, that Plaintiff had defrauded her when she made her investment (with her children's funds) in Investor Clout in 2007.

91. In the Investor Clout Lawsuit, Linda Mayne now claims that, when she made her investment in Investor Clout in 2007, Plaintiff represented to her that the loans were "guaranteed," but that Plaintiff never obtained the signature of the guarantor.

92. Linda Mayne now claims that Plaintiff defrauded her; she now alleges that, if she had known the Investor Clout Loan was not guaranteed, she would not have made her investment in Investor Clout.

93. In fact, however, Linda Mayne is lying, and she has possessed the fully executed written "guarantee" in her files since 2007. *See Exhibit E.*

94. To support his wife, Linda Mayne, Defendant Mayne began to make identical false allegations of securities fraud against Plaintiff, his former law client whom he had previously successfully defended before the SEC.

95.    Although Defendant Mayne previously praised Plaintiff's integrity in relation to Mortgages Ltd., he now began to claim that Plaintiff was dishonest and was not entitled to distributions because of illegality, unclean hands and other baseless allegations.

96.    Defendant Mayne began to assert, for the first time, that Plaintiff had defrauded the Stephen Mayne Trust when it made its investment in Investor Clout in 2007.

97.    Defendant Mayne now claims that, when the Stephen Mayne Trust made its investment in Investor Clout, Plaintiff represented to Defendant Mayne that the loans were "guaranteed," but that Plaintiff never obtained the signature of the guarantor.

98.    Defendant Mayne now claims that Plaintiff defrauded the Stephen Mayne Trust; he now alleges that, if he had known the Investor Clout Loan was not guaranteed, the Stephen Mayne Trust would not have made its investment in Investor Clout.

99.    In fact, however, Defendant Mayne is lying, and he has possessed the fully executed written "guarantee" in his files since 2007. *See Exhibit E.*

100.   In the Investor Clout Lawsuit, Linda Mayne alleges that Plaintiff filed false partnership information returns for Investor Clout for the 2010, 2011, 2012, 2013, 2014 and 2015 taxable years, by failing to report his share of the partnership's taxable income for those years.

101.   To support his wife, Linda Mayne, Defendant Mayne has "parroted" her tax evasion allegations against Plaintiff, his former law client.

102.   In fact, Plaintiff was not a Partner in Investor Clout during those years, and Investor Clout and its Partners reported *no taxable income* in any of those years (because each of the partnership properties sold for a loss).

103. Neither Linda Mayne nor the Stephen Mayne Trust reported any taxable income from Investor Clout from 2010 through 2015.

104. In the Investor Clout Lawsuit, Linda Mayne also alleges that Plaintiff was responsible for $7,000 in tax penalties incurred in those years, because he was the Managing Partner and Tax Matters Partner.

105. To support his wife, Linda Mayne, Defendant Mayne has "parroted" her breach of fiduciary duty allegations against Plaintiff, his former law client, even though he knew that they were false.

106. In fact, Plaintiff was not a Partner in Investor Clout during those years, and the Managing Partner and Tax Matters Partner was Linda Mayne.

107. In the Investor Clout Lawsuit, Linda Mayne also alleges that Plaintiff received substantial *pro rata* partnership distributions from 2010 through 2015 that were not reported by him on the partnership information returns or his Form K-1s.

108. To support his wife, Linda Mayne, Defendant Mayne has "parroted" her tax reporting allegations against Plaintiff, his former law client, even though he knows that they are false.

109. In fact, Plaintiff did not receive any *pro rata* partnership distributions in those years, and neither Linda Mayne nor the Stephen Mayne Trust have produced any checks or other documentation substantiating these allegations (because there are no such checks or other documentation).

110. In the Investor Clout Lawsuit, Linda Mayne now alleges that, in 2010, when she purchased Plaintiff's 55.56% partnership interest in accordance with Defendants' advice (as hereinabove described), she was actually assisting Plaintiff, who was her husband's client at the time, in hiding his partnership interest from his creditors.

15

111. Linda Mayne now alleges that, when she purchased Plaintiff's 55.56% partnership interest, it was a "sham" transaction designed to hide, with her assistance, Plaintiff's assets from his creditors.

112. To support his wife, Linda Mayne, Defendant Mayne has "parroted" her "sham transaction" allegations against Plaintiff, his former law client, even though he knows that they are false.

113. In fact, however, Linda Mayne purchased Plaintiff's 55.56% partnership interest pursuant to a plan devised by Defendant Mayne to hopefully enhance Investor Clout's chances to join an investor-plaintiff group and to ultimately prevail on the merits in a lawsuit against Mortgages Ltd.'s attorneys and accountants.

114. The plan devised by Defendant Mayne to enhance Investor Clout's chances to join an investor-plaintiff group was lawful.

115. In the Investor Clout Lawsuit, Plaintiff has been attempting to recover more than $200,000 to which he is entitled (and has already been received by Investor Clout).

116. To support Linda Mayne's bad faith desire to prevent Plaintiff from receiving his funds, Defendant Mayne has refused to tell the truth; he has concealed relevant evidence; and he has falsely discredited Plaintiff.

117. Defendant Mayne has shared Plaintiff's confidential information with Linda Mayne.

118. Defendant has a conflict of interest and has always subordinated Plaintiff's best interests to his own personal interests.

119. Plaintiff has not received his share of all partnership distributions, and Defendant Mayne is wrongfully aligning with his wife, Linda Mayne, against Plaintiff.

120. Plaintiff has made repeated efforts to get the senior management of Defendant Manatt involved in this dispute, but they have refused.

## FIRST CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

121. Plaintiff hereby repeats and realleges the allegations set forth in Paragraphs 1 through 120 above, as though fully set forth herein.

122. Defendant Mayne owe a fiduciary duty to Plaintiff, as his former law client.

123. Defendant Manatt owe a fiduciary duty to Plaintiff, as its former law client.

124. Defendant Manatt is liable for the fiduciary breaches of its law partner, Defendant Mayne, under the doctrine of *respondent superior*.

125. As former legal counsel for Plaintiff, Defendant Mayne breached his fiduciary duties to Plaintiff by, among other things, making false and negative statements about Plaintiff. regarding Plaintiff and Investor Clout in order to support his wife in an obvious conflict of interest, in order to enrich himself and harm Plaintiff.

126. Defendant Mayne breached his fiduciary duties to Plaintiff by contradicting and denying his original legal advice to Plaintiff, in order to enrich himself and harm Plaintiff.

127. Defendant Mayne breached his fiduciary duties to Plaintiff by disclosing confidential information to his wife, Linda Mayne.

128.   Defendant Mayne breached his fiduciary duties to Plaintiff by accusing him of securities fraud after (a) previously defending him before the SEC and Arizona Corporations Commission in their investigations of Mortgages Ltd. in 2008, and (b) praising his integrity at all times until his wife, Linda Mayne, became estranged from Plaintiff.

129.   Defendant Mayne has chosen to lie, conceal key evidence and discredit Plaintiff, his former law client, all of which has caused irreparable harm to Plaintiff.

130.   Plaintiff has been damaged by Defendants' breaches of fiduciary duty, in an amount to be proven at trial.

131.   Plaintiff has also suffered severe emotional distress at the hands of Defendant Mayne.

132.   Defendant Mayne acted with an evil hand and an evil mind. Defendant Mayne acted with ill will toward Plaintiff and intended to harm him; therefore, Plaintiff is entitled to an award of exemplary or punitive damages from Defendant Mayne.

WHEREFORE, Plaintiff Robert Furst respectfully requests that the Court enter judgment in his favor, as follows:

A. Awarding Plaintiff Robert Furst damages against Defendants for breach of fiduciary duty, in an amount to be determined at trial;

B. Awarding Plaintiff Robert Furst exemplary or punitive damages against Defendants.

C. Awarding Plaintiff Robert Furst his attorneys' fees and costs incurred herein; and

D. Awarding such further relief as the Court deems just and proper.

DATED:  August 16, 2021

RFurst
_____
Robert G. Furst

# EXHIBIT A

XXX + OUT + + RETURN MY CALL

IM NOT ON MY OWN

ACCOUNT ONLY

YOUR BOE

HOW DID THAT HAPPED

Y POWER OF ATTORZY

XXX YOU CANCEL IT RIGHT NOW

REVOKE POWER OF ATTNY

YOU NEVER TOLD ME IT WAS

. A POWER OF ATTONEY

JUST SIEU THIS . AFTER

FLYING IN FROM SF

WHO OR WHAT WERE

CONCERNED ABOUT

( I THINK - YOU)

X ( WENT TO MY ACCOUNT

X ) THEY SAID - I DIDN'T

X ) HAVE ONE. YOU PREVENTED

ME FROM ACCESSING MY ACCOUN

XX ISLAD OF UNDERH DATES

# EXHIBIT B

From: Linda Mayne <mayneco@gmail.com>
Date: February 13, 2019 at 2:17:12 PM PST
To: Robert Furst <rgfurst@aol.com>

Bob,

I agree with your proposal regarding splitting the pension assets into two IRAs and confirmed with SCHWAB that it could transfer the assets to the new IRA accounts as you suggested.  Please provide whatever documentation you believe is required to accomplish the transfer you requested, and I will submit it to SCHWAB.

I have provided all the most recent account statements including credit card and banking.  I also am blocked out of the DHF Corp. Schwab account so that statement is excluded. I have just transferred another $10K from the Schwab Furst Family Trust account to Mom's checking account (it has not shown up yet) to cover the next months care as the Garden's of Scottsdale require payment in advance.

Regarding the sale of the house, you indicated you would like to sell it quickly. As I understand it, your preferred broker offered suggested a selling price of $1.1 million and a 6% commission for selling the house for $1.1. In order to show the house, it of course needs to be cleared out. After you take anything you want from the house, I suggest Hospice take whatever it wants, the remaining furniture be sold and the sale proceeds be given to Hospice, and whatever is left over be taken to the dump.

As you know, I think the house could sell for more than $1.1 million, but a sale above $1.1 may take some time and patience. If a quick sale is of interest to you, I would be willing to purchase your half interest now for cash on the basis of the $1.1 million suggested sale price you received from your preferred broker, minus the 6% commission, $66,000 and estimated $5500 in closing costs. Based on this offer, I would pay you $515,000 now for your half interest.  We would need to provide the title company proper re-titling and documentation that will allow me to sell the house without your further involvement.  We would close in 7 days after the title company paperwork is completed. If you would like to proceed on this basis, then as soon as you have taken what you want out of the house, I will take the responsibility of clearing the house out, selling what I can for the benefit of Hospice, etc.

# EXHIBIT C



08/02/2019


Robert Furst & Linda Mayne Tr
107 Cypress Ave
Kentfield, CA 94904



Re: Your TD Ameritrade Account Ending in 9183

Dear Robert Furst & Linda Mayne Tr,

Thank you for allowing me to assist you today. As you requested, this message is to confirm that Linda Mayne added the no funds out and no trades restrictions to this account in February 2019.

If we can be of any further assistance, please let us know. Just log in to your account and go to the Message Center to write us. You can also call Client Services at 800-669-3900. We're available 24 hours a day, seven days a week.

Sincerely,

Nicole Coplin
Resource Specialist
TD Ameritrade

This information is furnished as part of a general information service and TD Ameritrade shall not be liable for any damages arising out of any inaccuracy in the information. Because this information may differ from your TD Ameritrade monthly statement, you should rely only on the TD Ameritrade monthly statement as the official record of your TD Ameritrade account.

Market volatility, volume, and system availability may delay account access and trade executions.

TD Ameritrade, Inc., member FINRA/SIPC ( www.finra.org , www.sipc.org ). TD Ameritrade is a trademark jointly owned by TD Ameritrade IP Company, Inc. and The Toronto-Dominion Bank. © 2015 TD Ameritrade IP Company, Inc. All rights reserved. Used with permission.